IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 06-cv-01273-WYD-BNB

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

v.

ALBERTSON'S INC.,
ALBERTSON'S LLC,
SUPERVALU INC., and
CERBERUS CAPITAL MANAGEMENT, L.P.,

Defendants.
_____

**ORDER**
_____

This matter is before me on the **Plaintiff EEOC's Emergency Motion for a Protective Order Prohibiting *Ex Parte* Communications With Class Members** [Doc. # 11, filed 8/12/2006] (the "Motion"). I held a hearing on the Motion on September 21, 2006, and took the matter under advisement. The Motion is DENIED.

The EEOC asserts that it has brought suit "on behalf of a class" of all "black and Hispanic employees subjected to racial and ethnic harassment" by Albertson's at its Distribution Center in Aurora, Colorado. Motion at pp.1-2. The suit alleges violations of Title VII of the Civil Rights Act of 1964. Id.

According to the EEOC, the dispute underlying this Motion arose as follows:

> At the commencement of litigation, EEOC sent Defendant
> Albertson's a letter on July 13, 2006 describing the scope of the
> potential class--namely, all current or former black or Hispanic
> employees employed at the Albertson's Distribution Center in

> Aurora, CO from January 1, 1995 to the present.  Citing Colorado Rule of Professional Conduct 4.2 and relevant caselaw, EEOC asserted an attorney-client relationship with respect to the class members and advised Defendant Albertson's of EEOC's intent to seek a protective order if counsel [for] Defendant Albertson's or any agent acting on counsel's request initiated *ex parte* communications with potential class members.
>
> Defendant Albertson's disagreed with the EEOC's position and proceeded to conduct interviews with potential class members without notifying the EEOC. . . .  These interviews were with potential class members who are current employees at the Distribution Center, and were conducted during the employee's scheduled work hours and without the opportunity to have representation by the EEOC.

Id. at pp.2-3.  The EEOC seeks the following relief:

> EEOC respectfully requests that this Court enter a protective order prohibiting Defendant from engaging in *ex parte* communications with potential Class Members except by noticed deposition or prior agreement with the EEOC.  Second, EEOC seeks an order that Defendant immediately provide the EEOC with all information obtained during *ex parte* communications. . . .  Finally, the EEOC requests an order requiring Defendant Albertson's to provide EEOC attorneys a private meeting room at the Distribution Center and access to all employees during their regularly scheduled work day to facilitate individual interviews immediately.

Id. at pp.11-12.

I.

This is not a class action subject to Rule 23, Fed. R. Civ. P.  To the contrary, the Supreme Court ruled in General Telephone Co. of the Northwest, Inc. v. EEOC, 446 U.S. 318 (1980), that § 706 of the Civil Rights Act of 1964 authorizes the EEOC to bring actions to enforce Title VII on behalf of a number of aggrieved persons without obtaining class action certification under Rule 23.  In so ruling, the Court explained:

2

> We do no more than follow a straightforward reading of the statute, which seems to us to authorize the EEOC to sue in its own name to enforce federal law by obtaining appropriate relief for those persons injured by discriminatory practices forbidden by the Act.
>
> This understanding of the statute is supported by the purpose of the 1972 amendments of providing the EEOC with enforcement authority. The purpose of the amendments, plainly enough, was to secure more effective enforcement of Title VII. . . . The 1972 amendments to § 706 accordingly expanded the EEOC's enforcement powers by authorizing the EEOC to bring a civil action in federal district court against private employers reasonably suspected of violating Title VII. . . . The amendments did not transfer all private enforcement to the EEOC and assign to that agency exclusively the task of protecting private interests. The EEOC's civil suit was intended to supplement, not replace, the private action. The EEOC was to bear the primary burden of litigation, but the private action previously available under § 706 was not superseded. Under § 706(f)(1), the aggrieved person may bring his own action at the expiration of the 180-day period of exclusive EEOC administrative jurisdiction if the agency has failed to move the case along to the party's satisfaction, has reached a determination not to sue, or has reached a conciliation or settlement agreement with the respondent that the party finds unsatisfactory. The aggrieved person may also intervene in the EEOC's enforcement action. *These private-action rights suggest that the EEOC is not merely a proxy for the victims of discrimination and that the EEOC's enforcement suits should not be considered representative actions subject to Rule 23.*

Id. at 324-25 (internal citations omitted; emphasis added). The Supreme Court noted further that when the EEOC brings an enforcement action it "does not function simply as a vehicle for conducting litigation on behalf of private parties; it is a federal administrative agency charged with the responsibility of investigating claims of employment discrimination. . . ." Id. at 326 n.8.

Prior to 1972, in addition to the availability of private party suits, the Department of Justice through the Attorney General had the authority to bring pattern-and-practice suits against

3

alleged violators of Title VII.  Id. at 328.  The Supreme Court reviewed the legislative history of the 1972 amendments to Title VII and found:

> As we have said, the Department of Justice brought its suits in the name of the United States and without obtaining certification under Rule 23--*it did not sue as a representative of the persons aggrieved*--and we must assume Congress' familiarity with the procedure.  It is clear that with the 1972 amendments Congress intended the EEOC to proceed in the same manner; and thus, given the context, it is similarly clear that the references in debate to "class" suits referred to the availability of relief and not the procedure that would be applicable in such actions.

Id. at 329 (emphasis added).

Finally, in a footnote the Court noted in passing:

> Petitioners [employers] characterize this action as a "class action"; the EEOC characterizes it as an action "affecting a class of individuals."  We need not choose between these characterizations.  The issue is whether an action, however it is styled, brought by a Government agency to enforce the federal law with whose enforcement the agency is charged is subject to the requirements of Rule 23.

Id. at 323 n.5.

I have reviewed the General Telephone Co. case in detail because it is important to understand that an EEOC enforcement action under Title VII is not merely a class action relieved of the burdens of Rule 23.  Rather, § 706 of the Civil Rights Act of 1964 creates a distinct form of action which permits the EEOC to proceed in its own name to investigate and remedy violations of Title VII; in doing so, to obtain appropriate relief for those persons injured by discriminatory practices forbidden by Title VII; but without relegating the EEOC to a mere proxy, or representative, for the individuals.  Nor does § 706 grant exclusive authority in the

EEOC to enforce Title VII; the aggrieved individuals may pursue their own actions or may intervene in actions brought by the EEOC.

It is against this procedural backdrop that I must determine whether the EEOC has established that it has an attorney-client relationship with each of the black and Hispanic employees at Albertson's Distribution Center in Aurora, Colorado, as it claims in the Motion.

II.

Although this case is not a class action, the Supreme Court's decision in Gulf Oil Co. v. Bernard, 452 U.S. 89 (1981), provides guidance as how I should approach the pending Motion. There, as here, the EEOC alleged discrimination against an employer, Gulf Oil ("Gulf"), in violation of Title VII. The EEOC and Gulf had entered into a conciliation agreement pursuant to which Gulf agreed to cease various forms of allegedly discriminatory practices, to undertake an affirmative action program, and to offer back pay to alleged victims of the discrimination. Id. at 91. Thereafter:

> Gulf began to send notices to the 643 employees eligible for back pay, stating the exact amount available to each person in return for execution within 30 days of a full release of all discrimination claims dating from the relevant time period.
>
> Approximately one month after the signing of the conciliation agreement . . ., respondents [the representative class action plaintiffs] filed this class action . . . on behalf of all black present and former employees, and rejected applicants for employment, at the refinery.

Id. at 91-92 (internal footnote omitted).

There were now competing interests at play. Gulf and the EEOC sought to have the employees join in the conciliation agreement, while the class representatives sought to have the

employees reject the conciliation agreement and join in the class action. Gulf filed a motion seeking an order limiting communications by the class representatives and their counsel with Gulf's employees pending a final decision about whether the employees would join in the EEOC's conciliation agreement, arguing in support:

> Gulf stated that after it was served in the case, it ceased sending back pay offers and release forms to class members. It then asserted that a lawyer for respondents, Ulysses Gene Thibodeaux, had attended a meeting of 75 class members . . . where he had discussed the case and recommended that the employees not sign the releases sent under the conciliation agreement. Gulf added that Thibodeaux reportedly had advised employees to return checks they already had received, since they could receive at least double the amounts involved through the class action.

Id. at 92-93.

Eventually the court entered an order banning all communications concerning the class action between the class representatives and their counsel and any actual or potential class members. Id. at 95. The order exempted from its ban the communications from Gulf to its employees involving the conciliation agreement. Id. The court did not base its order on any findings of fact, relying instead only on unsworn allegations by Gulf of misconduct by the class representatives and their counsel, and did not include any meaningful explanation for its action. Id. at 96, 98.

On review, the Supreme Court held that the order prohibiting communications between class representatives and their counsel, on the one hand, and potential class members, on the other hand, was improper, reasoning:

> Class actions serve an important function in our system of civil justice. They present, however, opportunities for abuse as well as problems for courts and counsel in the management of cases.

6

> Because of the potential for abuse, a district court has both a duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. But this discretion is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules. . . .
>
> In the present case, we are faced with the unquestionable assertion by respondents that the order created at least potential difficulties for them as they sought to vindicate the legal rights of a class of employees. The order interfered with their efforts to inform potential class members of the existence of this lawsuit, and may have been particularly injurious--not only to respondents but to the class as a whole--because the employees at that time were being pressed to decide whether to accept a back pay offer from Gulf that required them to sign a full release of all liability for discriminatory acts. . . .
>
> Because of these potential problems, an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. Only such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23. In addition, such a weighing--identifying the potential abuses being addressed--should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

Id. at 99-102 (internal footnotes omitted).

The issue here, unlike Gulf Oil, does not involve a potential ban on class action counsel attempting to contact potential members of a class. Rather, I am confronted here with a motion by the EEOC to prohibit defense counsel from contacting allegedly aggrieved parties outside of the presence of the EEOC's lawyers. Regardless of this distinction, which is an important one, I understand the Gulf Oil case to require that my determination of whether to impose any ban be based on a weighing of the need for a limitation against the potential interference that limitation

7

may cause with the rights of the parties. The weighing must identify the potential abuses being addressed and must be based on evidence. If I impose a limit on communications, it must be carefully drawn to restrict speech as little as possible, consistent with the rights of the parties under the circumstances

III.

Rule 4.2 of the Colorado Rules of Professional Conduct provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation *with a person the lawyer knows to be represented by another lawyer in the matter*, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

(Emphasis added.) With certain exceptions not applicable here, the Colorado Rules of Professional Conduct apply to matters pending in this Court pursuant to D.C.COLO.LCivR 83.4. Consequently, Rule 4.2 applies to Albertson's counsel.

The first question in applying Rule 4.2, Colo. R. Prof. Conduct, and the controlling question in the determination of this Motion, is whether the black and Hispanic employees at Albertson's Distribution Center are in fact represented by the EEOC. See Douglas R. Richmond, *Class Actions and Ex Parte Communications: Can We Talk?*, 68 MO. L. REV. 813, 817 (2003) (noting that in considering whether there has been a violation of Rule 4.2 "it is first important to ascertain if the person with whom communication is desired is in fact represented by another lawyer in the matter"). "The key factor in determining whether an attorney-client relationship exists typically is the rendering of legal advice by the attorney." Id.

In the class action context, which is informative, the general rule is that defendants may communicate with potential plaintiff class members before the class is certified. Id. at 849. This

is especially true where a defendant has an on-going business relationship with potential class members:

> Defendants may need to communicate with class members as part of their regular business activities. Beyond that, putative class members may be interested in receiving settlement offers or in hearing a defendant's perspective on the litigation. Putative class members may have interests or needs that are different from those of the class representatives, and courts are wrong to discount or disregard that possibility, or to assume that putative class members always need protection from defendants. After all, "class members do not become wards, incompetent to deal with their own property, by reason of the unilateral filing of class action complaints by one of their number." [Quoting In re Winchell's Donut House, L.P., 1988 WL 135503, at *1 (Del. Ch. Dec. 12, 1988).]

Id.

A class action is in a "state of flux" during the time after a class is certified but before the deadline for parties to opt out of the action. Id. at 858. During this period, courts are divided as to whether a defendant may contact the class members:

> [S]ome courts hold that while certification changes the relationship between plaintiffs' counsel and the putative class members, it creates only a potential attorney-client relationship. Other courts recognize that class certification creates an attorney-client relationship during the opt out period. . . . Still other courts appear to have simply thrown up their hands, saying that before the opt out period expires the status of plaintiffs' counsel in relation to the class members cannot be stated with precision.

Id. (internal quotations and citations omitted).

I agree that at each phase of the class action process, an attorney-client relationship either exists with the putative class members or it does not:

> It is wrong to say that the attorney-client relationship between class counsel and putative class members during the time between certification and the expiration of the opt out period is less than

9

> "full," for such a description is not materially different from the timeless analogy to a woman being "a little pregnant." The description of the relationship between certification and opt out as being a "potential attorney-client relationship" is similarly flawed. Either class counsel share an attorney-client relationship with absent class members during this time or they do not. If they do, then a class member who opts out is simply terminating his attorney-client relationship with class counsel, as it always his right. If they do not share an attorney-client relationship during this period, then assuming that they do not attempt to coerce or mislead class members, defense counsel ought to be able to unilaterally communicate with them without running afoul of Rule 4.2. . . .

Id. at 859 (internal footnote omitted). The same is true in an EEOC action to enforce Title VII.

In my view, an attorney-client relationship is a voluntary, contractual relationship that requires the consent of both the attorney and the client. Id. at p.859 and n.360. In general, it cannot be created by the attorney alone and without the consent of the client.[1]

Whether or not an attorney-client relationship exists, however, a court through its supervisory authority always has the power to step in and prevent or remedy misconduct by defendants or their counsel, including any attempts to mislead, coerce, intimidate, or otherwise take advantage of potential class members or aggrieved parties in an EEOC enforcement action. Richmond, supra, at 849.

### IV.

Applying these principles here, I find that the Motion should be denied insofar as it seeks an order prohibiting Albertson's from contacting allegedly aggrieved parties prior to the EEOC entering into an attorney-client relationship with those individuals. The EEOC's actions merely in

---

[1] A court's certification of a class in a class action case is deemed to create an attorney-client relationship between class counsel and all class members, Richmond, supra, at p.826, and presents an exception to the general rule.

filing an enforcement case and identifying a group of people as being among the allegedly aggrieved parties, without more, is insufficient to create an attorney-client relationship between the allegedly aggrieved parties and the EEOC. Courts confronted with the same issue have ruled similarly.

For example, in EEOC v. Dana Corp., 202 F. Supp. 2d 827 (N.D. Ind. 2002), an EEOC enforcement action brought to remedy alleged violations of Title VII, the defendant/employer (Dana) sought an order allowing it to conduct *ex parte* interviews with "certain . . . employees that have not established an attorney-client relationship with the EEOC but have been identified as potential class members." Id. at 828. The court granted the motion, stating:

> The court finds that until certain individuals characterized as "potential class members" establish an attorney-client relationship Dana is permitted to engage in such *ex parte* communications. However, counsel for Dana runs the risk of running afoul of Rule 4.2 should it conduct any *ex parte* communications with a represented party and should be extremely careful before proceeding along this path in conducting interviews. . . . [S]uch *ex parte* interviews may be allowed to the extent that the EEOC cannot demonstrate the establishment of an attorney-client relationship. The court strongly urges both parties to communicate with one another on the issue of which individuals have established an attorney-client relationship before any such communication with these individuals takes place.

Id. at 830.

In EEOC v. Int'l Profit Associates, Inc., 206 F.R.D. 215 (N.D. Ill. 2002), the court found that certain allegedly aggrieved employees had established an attorney-client relationship with the EEOC. In doing so, however, the court did not rely merely on the fact that the EEOC claimed that the particular employees were among the allegedly aggrieved parties; instead, the court noted that the women had "contacted the EEOC via returned questionnaires or telephone calls" and that

"each woman identified as a class member was asked if she wished the EEOC to act in her behalf in this lawsuit and each class member replied in the affirmative." Id. at 218. These acts were sufficient, in that court's view, to find that an attorney-client relationship had been established.

In EEOC v. Johnson & Higgins, Inc., 1998 WL 778369 (S.D.N.Y. Nov. 6, 1998), the court noted in connection with an EEOC enforcement action that "[w]hether a privileged attorney-client relationship exists rests upon the client's intent to seek legal advice and the client's belief that he is consulting an attorney. . . . The burden of sustaining the privilege is on the proponent--here, the EEOC." Id. at *4. The court went on to hold that only documents which "post-date the first time Retirees Aiena, Benjamin, Bergsten, Seward and Shattuck *consulted with the EEOC* are covered by the attorney-client privilege," and that documents that "pre-date the Retirees' *first consultation with* the EEOC are not privileged and therefore must be produced." Id. at **5-6 (emphasis added). Here again, the court found that the attorney-client relationship was not established until a allegedly aggrieved party "consulted with" an EEOC lawyer.

In EEOC v. Chemtech Int'l Corp., 1995 WL 608333 at *2 (S.D. Tex. May 17, 1995), the court relied on an affidavit from the client stating that he believed that an attorney-client relationship existed between himself and the EEOC as evidencing the existence of an attorney-client relationship. Similarly, in EEOC v. Georgia-Pacific Corp., 1975 WL 267 (D. Ore. Nov. 10, 1975), the court relied on the contents of the client's contacts with the EEOC--letters clearly indicating that she was contacting the EEOC litigation center for expert legal advice and

that she expected her communications to remain confidential--as establishing an attorney-client relationship between the woman and the EEOC.

The EEOC has directed me to EEOC v. Nebco Evans Dist., Inc., 1997 WL 416423 (D. Neb. June 9, 1997), as holding that an attorney-client relationship is created between the EEOC and the allegedly aggrieved employees upon the filing of the complaint and without any further proof of such a relationship. In that case, the court precluded the employer's counsel from contacting the employees under Rule 4.2 without EEOC approval. The claim in Nebco, however, alleged a violation of the ADEA, not Title VII, a distinction which the court found controlling:

> Unlike the Title VII enforcement provisions, under the ADEA, the right of an individual to bring a private action "shall terminate upon the commencement of an action by the Equal Employment Opportunity Commission to enforce the right of such employee under this chapter." 29 U.S.C. § 626(c)(1). . . .
>
> [B]ecause Congress created a private right of action under the ADEA but cut it off once the EEOC begins its action, the conclusion that the EEOC is the individual's representative in ADEA suits seems inescapable. . . .
>
> In this case, the Court is satisfied that the EEOC is serving as the applicants' representative because it has filed suit for individual relief on their behalf and thereby cut off the applicants' private right of action for that relief. Because of the representative relationship, informal interviews by the defendant with an applicant without the prior consent of counsel for the EEOC would violate [the] ethical rules.

Id. at *4. Consequently, Nebco provides no support for the EEOC's position here, where the EEOC is asserting a Title VII violation, not a violation of the ADEA. As the Supreme Court noted in General Telephone Co. of the Northwest, Inc. v. EEOC, 446 U.S. at 329, when the EEOC sues in connection with Title VII violations, it does not sue "as a representative of the

13

persons aggrieved."

Finally, the <u>Gulf Oil</u> case demonstrates that allegedly aggrieved parties may choose not to be represented by the EEOC and may become adverse to the EEOC's position. <u>Gulf Oil</u>, 452 U.S. at 100 (disapproving an order prohibiting class counsel from contacting potential class members pending their decision of whether to accept a conciliation agreement reached between the EEOC and Gulf because the order improperly interfered with efforts to inform potential class members of the existence of an alternative class action at a time when the employees were being pressed to decide whether to accept the terms of the conciliation agreement).

Although I set the Motion for a hearing and was prepared to accept evidence, no party offered any at that time. The EEOC has provided no evidence whatsoever; Albertson's has submitted four affidavits, each detailing the environment in which the interviews of allegedly aggrieved parties were conducted. According to the uncontroverted affidavits before me:

(1)   Everyone interviewed consented to the interview;

(2)   Everyone interviewed was provided with a written statement prior to the interview, which they signed, informing them (a) of the pending litigation by the EEOC; (b) that the attorneys conducting the interviews represented Albertson's; (c) that the interviews were voluntary; and (d) that there would be no reward or penalty associated with the decision to be interviewed;

(3)   Everyone interviewed specifically acknowledged that they had not requested any EEOC lawyer to represent them; and

      (4)      No one interviewed was told during the interview that their claims are outside the scope of the EEOC's pending action.

Affidavits of Naomi Young, Amanda Paquet, Antonio Villegas, and Kimberly M. Talley In Support of Defendant Albertson's Opposition to the Plaintiff EEOC's Emergency Motion for a Protective Order [Docs. # 21-24, filed 9/13/2006].

      The EEOC argues, but without any evidentiary support, that allowing Albertson's lawyers to speak *ex parte* to allegedly aggrieved parties creates the following risk:

> One of the purposes behind ethical rules prohibiting *ex parte* contact with the represented persons is to prevent lawyers from taking advantage of uncounseled lay persons.
>
> Class members in EEOC actions are generally more vulnerable than represented parties in private actions to the risk of unintentionally compromising their claims, especially when the counsel questioning them represents the class members' employer.

Motion, at p.8.  These generalizations are insufficient to persuade me that a limitation on Albertson's right to speak to as yet unrepresented parties is necessary.

V.

      Absent some evidence that allegedly aggrieved parties have established an attorney-client relationship with the EEOC, I will not impose one upon them.  Counsel for Albertson's may contact any allegedly aggrieved party not represented by another lawyer to discuss the matters raised in this action.  Of course, Albertson's lawyers are prohibited by Rule 4.2 from contacting anyone they know to be represented by another lawyer in this matter, unless they obtain the consent of the other lawyer or are authorized to do so by law or by a court order.

Upon a showing of some misconduct by Albertson's lawyers, which has not been made at this time, such as attempts to mislead, coerce, intimidate, or otherwise take advantage of the allegedly aggrieved parties, I will consider establishing limits or guidelines to address the misconduct.

The EEOC has presented no authority, and I am not aware of any, for the additional relief it seeks.

IT IS ORDERED that the Motion is DENIED.

Dated October 4, 2006.

                                            BY THE COURT:

                                            s/ Boyd N. Boland
                                            United States Magistrate Judge